UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| FRIENDS OF THE MAHONING RIVER, ) <br> ) <br> Plaintiff, ) <br> ) <br> ) CASE NO. _____ <br> v. ) <br> ) <br> UNITED STATES ARMY CORPS OF ) JUDGE: <br> ENGINEERS and COLONEL ANDREW ) <br> J. SHORT, COMMANDER, UNITED ) <br> STATES DISTRICT ARMY CORPS OF ) **COMPLAINT** <br> ENGINEERS, PITTSBURGH DISTRICT ) <br> ) <br> Defendants. ) <br> ) | |

## INTRODUCTION

1. This is an action for declaratory and injunctive relief challenging Defendant United States Army Corps of Engineers' ("USACE") improper issuance of Permit Number LRP-2017-1643 ("the 404 Permit") for the dredge and fill of waters of the United States pursuant to Section 404 of the Clean Water Act ("CWA"), 33 U.S.C. §1344. The 404 Permit is attached as Exhibit A and incorporated herein.

2. Defendant USACE issued the 404 Permit to North Eastwood, LLC on September 25, 2019, allowing North Eastwood LLC ("North Eastwood") to permanently impact 15.95 acres of wetlands and 1,608.5 linear feet of streams in Howland Township and the City of Niles in Trumbull County, Ohio.

3. North Eastwood has stated it intends to build an approximately 100-acre development, known as the Enterprise Park Project, on the location identified in the permit.

1

4. The 404 Permit states that the project's purpose is the construction of a new hospital facility and attendant medical/educational/residential campus facilities. This is the purpose identified by applicant North Eastwood in its application, and according to the language of the 404 Permit, it is also the purpose USACE relied upon in authorizing the fill and dredge activity described in the 404 Permit.

5. Upon information and belief, to date no binding commitment has been made by any medical entity to occupy the Enterprise Park Project.

6. Upon information and belief, to date there has been no demonstration of need for a medical complex in the area.

7. USACE may only grant a §404 Permit where the proposed activity is in the public interest, as determined by balancing its expected benefits against its reasonably foreseeable detriments. This involves a careful weighing of all factors that are relevant to a given case. 33 C.F.R. §320.4(a)(1).

8. In conducting its public interest review, USACE regulations state that "most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. §320.4(b)(1).

9. In general during its public interest review, USACE must consider 1) the extent of the public and private need for the proposed structure or work; 2) the practicability of using reasonable alternative locations and methods to accomplish the objectives of the structure or work; and 3) the extent and permanence of the beneficial and/or detrimental effects that the proposed structure or work is likely to have on the public and private uses to which the area is suited. 3 C.F.R. §320.4(a)(2).

10. In its public interest review, USACE improperly emphasized the alleged benefits of the project without giving due consideration to the project's detrimental effects, and did not conduct a robust independent analysis of alternative sites to minimize and avoid impacts to the Mosquito Creek and Mahoning River watersheds.

11. USACE's decision to issue the 404 Permit based on a flawed and improper public interest review was arbitrary, capricious, an abuse of discretion, and not in accordance with the requirements of the CWA and USACE regulations. USACE's arbitrary and capricious action is also a violation of the Administrative Procedure Act ("APA"), 5 U.S.C. §701-706 *et seq.*

12. Plaintiff Friends of the Mahoning River ("FOMR") is a non-profit organization with members who live, work, and recreate near the site of the proposed Enterprise Park. FOMR has members whose recreational and aesthetic interests will be harmed by the dredge and fill activity authorized by the 404 Permit.

13. Plaintiff urges this Court to order USACE to revoke the §404 Permit and conduct a proper public interest review under the CWA.

## JURISDICTION AND VENUE

14. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 (federal question) and 5 U.S.C. §§701-706 (APA).

15. This Court may issue a declaratory judgment and further relief pursuant to 28 U.S.C. §§2201 & 2202.

16. Venue is proper under 28 U.S.C. §3191(e) because Plaintiff FOMR resides in this district and the property to be impacted as a result of Defendant's issuance of the 404 Permit is located in this district.

## PARTIES

17. FOMR is a 501(c)(3) nonprofit organization that advocates to improve the quality of the Mahoning River and surrounding watershed through education, restoration, and recreation. FOMR has approximately 137 members throughout the region surrounding the Mahoning River, including members that live, work, and recreate in the vicinity of the proposed Enterprise Park.

18. Plaintiff brings this action on behalf of its members who live, work, and recreate in and in close proximity to the area that is the subject of the 404 Permit. FOMR member interests will be adversely affected by the negative impacts to wetlands and Mosquito Creek resulting from the 404 permit.

19. FOMR members regularly view from their homes the wetlands and streams that USACE authorized to be filled. These members enjoy the scenic beauty of the wetlands and streams, including viewing birds, other wildlife, and the wetland and riparian vegetation.

20. FOMR members enjoy kayaking and canoeing nearby and through the wetlands and streams that USACE has authorized to be filled. FOMR members will no longer be able to kayak and canoe this area once it has been filled pursuant to the 404 Permit. The Proposed project would also eliminate the reasons FOMR members enjoy paddling in the area, making them no longer able to enjoy this recreational activity.

21. FOMR members engage in social activities that involve kayaking, canoeing, walking, viewing, and otherwise enjoying the wetlands and streams authorized to be filled under the 404 Permit.

22. FOMR members enjoy bird watching in and nearby the area to be impacted by the activities authorized by the 404 Permit.

23. Defendant United States Army Corps of Engineers is the federal agency responsible for the issuance of Section 404 permits that comport with the requirements of the CWA and the APA.

24. Defendant Colonel Andrew J. Short is the Commander for the Pittsburgh District Office of the Corps, in Pittsburgh, Pennsylvania. The Pittsburgh District Office issues permits for the discharge of dredged and filled material under §404 of the CWA, and he issued the permit at issue in this case.

## STATUTORY AND REGULATORY BACKGROND

**CWA**

25. USACE regulates the discharge of dredged and fill material into the waters of the United States in accordance with Section 404 of the CWA. 33 U.S.C. §1344. In order to discharge dredged and fill material into waters of the United States, polluters must first obtain a permit from USACE.

26. In making Section 404 permitting decisions, USACE is bound by regulations issued by USACE (33 C.F.R. §320 *et seq.*) and by the U.S. Environmental Protection Agency ("USEPA") (40 C.F.R. §230 *et seq.*).

27. USACE may not permit the discharge of dredged or fill material "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. §230.10(D).

28. In issuing Section 404 permits, USACE must "examine practicable alternatives to the proposed discharge, that is, not discharging into water of the U.S. or discharging into an alternative aquatic site with potentially less damaging consequences." 40 C.F.R. 230.5(c).

5

29. These regulations also require that "no discharge of dredged or fill materials shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences." 40 C.F.R. 230.10(a).

30. The CWA considers an alternative "practicable" if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of the overall project purpose. 40 C.F.R. 230.10(a)(2).

31. Where the activity is not "water-dependent," it is presumed that a practicable alternative exists unless the applicant clearly proves otherwise. 40 CFR 230.10(a)(3).

32. In determining whether there's an alternative means of accomplishing the project's proposed purpose, USACE must in all cases look beyond the applicant's stated purpose and need for the project and "exercise independent judgment in defining the purpose and need for the project from both the applicant's and the public's perspective." 53 Fed. Reg. 3136 (Feb 3, 1988).

33. USACE is prohibited from issuing a 404 permit when the permitted activity will "cause or contribute to significant deterioration of the waters of the United States." 40 C.F.R. 230.10(c).

34. USACE may only grant a 404 permit upon a determination that "the benefits of the proposed alteration outweigh the damage to the wetlands resource." 33 C.F.R. 320.4(b)(1).

35. "Most wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." 33 C.F.R. §320.4(b)(1).

6

36. The USACE Mitigation Rule has the "fundamental objective" to "offset environmental losses resulting from unavoidable impacts to waters of the United States" that are authorized by USACE permits. 33 C.F.R. 332.3(a)(1).

37. In determining the compensatory mitigation to be included in a 404 permit, USACE must base its determination on "what is practicable and capable of compensating for the aquatic resource functions that will be lost as a result of the permitted activity. 33 C.F.R. 332.3(a)(1).

38. "In general, the required compensatory mitigation should be located within the same watershed as the impact site, and should be located where it is most likely to successfully replace lost functions and services." 33 C.F.R. 332.3(b)(1).

39. In considering compensatory mitigation, USACE must follow the sequence of options as set forth in 33 C.F.R. 332.3(b)(2–6), and compensatory mitigation is only to be considered after impacts to the site have been determined to be unavoidable. 33 C.F.R. 332.3(b)(1).

40. In considering compensatory mitigation, USACE must first consider avoiding and minimizing impacts, then mitigation bank credits, followed by in-lieu fee program credits, and lastly various forms of permittee-responsible mitigation. 33 C.F.R. 332.3(b)(2–6).

41. In-lieu fee programs involve funds being paid to a natural resource management entity for implementation of either a general or specific wetland or aquatic resource development project, and do not typically provide compensatory mitigation prior to project impacts, nor do they provide a timeline for when mitigation activities must begin.

7

42. USACE must use a watershed approach to establish compensatory mitigation requirements in a 404 permit, where "the ultimate goal of a watershed approach is to maintain and improve the quality and quantity of aquatic resources within watersheds through strategic selection of compensatory mitigation sites." 33 C.F.R. 332.3(c)(1).

**APA**

43. The APA provides that any agency action that is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law" is prohibited and may be overturned by a district court. 5 U.S.C. §706(2)(A).

44. The Corps is a federal agency subject to the APA.

45. When the Corps issues a § 404 permit, it is performing an "agency action" subject to judicial review under the APA.

## FACTS

46. The Enterprise Park Project consists of an approximately 100-acre development in Howland Township, Trumbull County.

47. The proposed development does not include water-dependent activities.

48. The 404 Permit allows the Project to permanently fill and destroy approximately 16 acres of high quality and unique urban wetlands in the Mosquito Creek watershed and the Mahoning River watershed.

49. The 404 Permit also allows permanent impacts to approximately 1,600 feet of streams within the Mosquito Creek and Mahoning River watersheds by a combination of earthen fill and culverts.

50. The area to be impacted is recognized as an Important Bird Area ("IBA") by the Audubon Society because of its significance for the wintering of waterfowl; as the nesting grounds of numerous species, including cerulean warblers (a Species of Concern in Ohio), prothonotary warblers (a Species of Concern in Ohio), bald eagles, wood thrush, scarlet tanager, blue-winged warblers, yellow-bellied sap suckers, hooded mergansers, and ovenbird.

51. The area to be impacted is also an IBA because it is a migration corridor for songbirds and shorebirds.  Migrating birds include Tennessee warblers, golden-winged warblers, northern waterthrushes, magnolia warblers, and cerulean warblers, among others.

52. Migration corridors are routes followed by songbirds and shorebirds traveling between winter and summer habitats.  These corridors are necessary to maintain flourishing wildlife populations.

53. The area to be impacted by the activities authorized under the 404 Permit is currently enjoyed by many community members, FOMR members, members of hunting and fishing groups, members of kayaking and canoeing groups, and members of birding groups.  Individuals and groups recreate in and nearby the area by kayaking, canoeing, fishing, hunting, birdwatching, walking, hiking, exploring, observing flora and fuana, and otherwise enjoying the serene and wildlife-filled natural environment.

54. Youngstown State University environmental studies students have visited the site to observe and learn from this unique urban wetland.

55. FOMR members who live adjacent to the proposed Project's site experience an abundance of flora and fauna on their own properties as a result of their proximity to this

flourishing natural environment, including nodding rattlesnake root, unusual fungi, red fox, white tailed deer, coyote tiger frogs, rare uni-sex salamanders, and black bear.

56. The Cleveland Museum of Natural History has visited properties directly adjacent to the proposed Project site to collect rare and unusual species, and to use some for inclusion in their own herbarium.

57. Community members, including FOMR members, also enjoy expansive views of the site while walking and hiking in the North Road Metro Park located across the creek from the proposed Project. This view, and the peace and tranquility it provides, will be destroyed by the proposed Project.

58. Individuals living on those properties neighboring the proposed Project site will never again witness the beauty of a sunrise over the natural wetlands and stream as a result of the Project.

59. Past efforts demonstrate that the community surrounding the proposed Project and Howland Township intended to preserve and protect the wetlands that are the subject of the 404 Permit because of their unique ecological, environmental, scenic, and recreational value.

60. The 404 Permit requires North Eastwood to purchase 30.5 wetland credits and 1,620 stream credits from an In-Lieu Fee Provider. There is no requirement for these in-lieu fee credits to go for the restoration or preservation of the Mosquito Creek, or even wholly to the Mahoning River watershed.

61. The Project, therefore, will permanently impact the long-term and short-term functions of the wetlands and streams within the Mosquito Creek and Mahoning River watersheds, and permanently impact the health and functions of the watersheds.

62. Upon information and belief, the Project will negatively impact the Mahoning River and the Mahoning River watershed.

63. Upon information and belief, the Project will negatively impact Mosquito Creek, its water quality and ecosystems, and the wildlife that inhabit it.

64. The Project will negatively impact the IBA, eliminating or reducing the winter habitat and nesting grounds for important bird species, including cerulean warblers, prothonotary warblers, and other songbirds and shorebirds.

65. The area surrounding the Project site historically and currently experiences significant flooding problems. Upon information and belief, the Project will exacerbate the flooding issues already experienced by surrounding and nearby properties.

66. U.S. Census Data demonstrates that the population of Trumbull County and the City of Warren is decreasing. The population of Trumbull County decreased approximately 6 percent between 2010 and 2018, and the population of Warren decreased approximately 8 percent during the same time period.

67. Despite this fact, in its public interest analysis, USACE relied upon North Eastwood's incorrect statement that Warren's population is increasing and had increased by 7.5 percent from 2010-2017, and that such an increase indicates a requirement for increased services in the area.

68. Aside from North Eastwood's own statements in its Application, there has been no demonstration of need in the record for a new hospital in the area of Warren or Trumbull County, Ohio where the project is proposed to be cited.

69. In its comments on the 404 Permit, USEPA did not believe that North Eastwood's application had demonstrated the purpose and need for the project, nor had it adequately

11

addressed alternative sites.  Memorandum for Record, attached and incorporated herein as Exhibit B.

70. Despite this lack of demonstrated need, USACE used a need for increased medical services in the area to justify the issuance of the 404 Permit and the destruction of these unique urban wetlands.

71. According to North Eastwood's Application, the Project will replace existing hospital facilities.  Upon information and belief, the Project will not create new long-term jobs in the area, but will only transfer jobs from existing facilities.

72. USACE relied on North Eastwood's statement that the facility would create 2100 *temporary* construction jobs to weigh in the favor of the Project's economic benefits.

73. Aside from North Eastwood's own statements in its Application, there is no evidence in the record to support assertions that the hospital will significantly benefit the Trumbull County economy.  Nonetheless, USACE included and improperly weighted these unproven benefits in its public interest review.

74. In evaluating the Project, USACE relied on the construction of a new hospital facility and attendant medical/educational/residential campus facilities as the Project's purpose.

75. Despite USACE relying on construction of a new hospital facility as the Project's purpose, the record includes no commitment by any hospital to occupy the proposed development.  Therefore, USACE improperly attributed benefits for a project purpose for which there is no support in the record.

76. USACE conducted no thorough, independent analysis on alternative locations for the project that would avoid or reduce impacts to wetlands and streams. Instead, USACE relied on the limited alternative sites set forth in North Eastwood's application and relied

solely on North Eastwood's stated purpose and need for the project, despite multiple other sites in close proximity being available and able to accommodate the Project.

77. FOMR members brought at least one other alternative location to USACE's attention. This location would not require the destruction of expansive high-quality wetlands or the fill of any streams and would have less impact on the Mosquito Creek and Mahoning River watersheds.

78. USACE did not hold a public hearing on the 404 Permit to hear the public's concerns regarding the proposed Project.

## CLAIMS FOR RELIEF

### COUNT 1
*USACE Conducted an Inadequate Public Interest Analysis in Violation of the CWA*

79. Plaintiff realleges and incorporates by reference herein all above allegations and aforementioned exhibits.

80. In granting the 404 Permit for the Enterprise Park Project, USACE failed to balance the purported benefits of the proposed action against its "reasonably foreseeable detriments" 33 C.F.R. §320.4(a)(1). Instead, USACE relied on inaccurate information to support benefits for which there was little or no evidence, while ignoring or discounting corresponding detriments relating to the environment, aesthetics, conservation, wetlands, fish and wildlife values, flood hazards, floodplain values, land use, recreation, water quality, and social justice.

81. USACE's determination that granting the 404 Permit was in the "public interest" constitutes agency action that is arbitrary, capricious, an abuse of discretion, and

otherwise not in accordance with law, in violation of the CWA and its implementing regulations, and actionable pursuant to the APA 5 U.S.C. §§702, 704, and 706(2)(A).

## COUNT 2
*USACE Issued the 404 Permit without Requiring Proper Compensatory Wetland Mitigation in Violation of the CWA*

82. Plaintiff realleges and incorporates by reference herein all above allegations and aforementioned exhibits.

83. The compensatory mitigation required in the 404 Permit does not comply with USACE's Mitigation Rule, 33 C.F.R. 332.3, in that it does not begin by avoiding and minimizing impacts to the wetlands and streams, and it does not take a watershed approach, but instead relies heavily on North Eastwood's purchase of In-Lieu Fee credits that may have no impact on the Mosquito Creek watershed. Accordingly, USACE's granting of the 404 Permit constitutes agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the CWA and its implementing regulations, and actionable pursuant to the APA 5 U.S.C. §§702, 704, and 706(2)(A).

## COUNT 3
*USACE Issued the 404 Permit without Conducting the Required Alternatives Analysis in Violation of the CWA*

84. Plaintiff realleges and incorporates by reference herein all above allegations and aforementioned exhibits.

85. By failing to consider multiple alternative locations for the project and alternative designs for the project that, upon information and belief, would have less impact to wetlands and streams, USACE did not comply with the alternatives analysis required under Section 404 of the CWA, pursuant to 40 C.F.R. 230.5(c) and 40 CFR 230.10.

86. USACE's granting of the 404 Permit without conducting a proper alternatives analysis constitutes agency action that is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law, in violation of the CWA and its implementing regulations, and actionable pursuant to the APA 5 U.S.C. §§702, 704, and 706(2)(A).

### **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff requests that this Court enter a judgment:

1. declaring that the Corps' issuance of the 404 Permit based on inadequate public interest review, inadequate compensatory mitigation, and deficient alternatives analysis violates the CWA and the APA;

2. directing the Corps' to revoke the 404 Permit for the Enterprise Park Development;

3. awarding Plaintiff their costs and reasonable attorneys' fees incurred in prosecuting this action; and

4. ordering such other relief as the Court may deem just and proper.

Respectfully submitted,

/s/ Megan M. Hunter

Megan M. Hunter
Ohio Bar No.: 96035
mhunter@fairshake-els.org

Andy J. Karas
Ohio Bar No.: 0097153
akaras@fairshake-els.org

Fair Shake Environmental Legal Resources
647 E. Market St.
Akron, OH 44304
234-571-1973
330-319-8856

15

## CERTIFICATE OF SERVICE

I, Megan M. Hunter, hereby certify that a true and correct copy of the foregoing was filed electronically on November 25, 2019 and sent to all parties and persons this 25th day of November 2019, via the means and at the addresses listed below as follows:

Colonel Andrew J. Short, Commander,      *U.S. Certified Mail,*
U.S. Army Corps of Engineers, Pittsburgh District      *Return receipt requested*
2200 William S. Moorhead Federal Building
1000 Liberty Ave.
Pittsburgh, PA 15222-4186

By: /s/ Megan M. Hunter
Megan M. Hunter (0096035)