PEARSON, J.

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | |
|---|---|
| FRIENDS OF THE MAHONING RIVER, ) | |
| ) | CASE NO. 4:19CV2771 |
| Plaintiff, ) | |
| ) | |
| v. ) | JUDGE BENITA Y. PEARSON |
| ) | |
| U.S. ARMY CORPS OF ENGINEERS, *et* ) | |
| *al.* ) | |
| ) | **ORDER** |
| Defendants. ) | [Resolving ECF Nos. 36, 37, 39] |

This case concerns the future of the Mosquito Creek Wetlands in Northeast Ohio. Friends of the Mahoning River ("Friends") challenges the decision of the United States Army Corps of Engineers and Colonel Andrew J. Short, Commander, United States District Army Corps of Engineers, Pittsburgh District (together, "the Corps") to issue Permit LRP-2017-1643 ("the Permit") to Defendant/Intervenor North Eastwood, LLC ("North Eastwood"). Pending before the Court are cross motions for summary judgment filed by Friends (ECF No. 36), the Corps (ECF No. 37), and North Eastwood (ECF No. 39). The motions are fully briefed. ECF Nos. 38, 40, 41, 42. For the foregoing reasons, the Court grants summary judgment in favor of Plaintiff, and denies the motions of Defendant and Defendant/Intervenor.

## Background

North Eastwood is the recipient of the Permit, which authorizes North Eastwood to permanently destroy and fill 15.95 acres of wetlands and 1,608.5 linear feet of streams in Howland Township and the City of Niles in Trumbull County, Ohio. ECF No. 1-1 at PageID #:18. The Permit was issued on September 25, 2019 pursuant to § 404 of the Clean Water Act as

(4:19CV2771)

part of North Eastwood's "Enterprise Park Project." *Id.* The stated reason the Permit is needed is for the construction of a hospital and several other medical, office, and residential outbuildings at the Enterprise Park site. R. 4889-90.[1]

North Eastwood applied for the Permit in July 2018. R. 4918. With its application, it submitted an evaluation of twenty-three alternative proposed sites for the Project, using the self-identified necessary criteria. *Id.* The Corps rejected the use of some of these criteria in its own analysis based on the statutory factors: "While the applicant included proximity to accessory amenities and the appropriateness of existing zoning in their analysis, the Corps only considered location and proximity to geographic center to allow the hospital to act as a hub for medical services for the Trumbull County region, size of parcel, accessibility, environmental feasibility, and estimated aquatic resource impact." R. 4918.

North Eastwood also generated four design plans which were modifications to its existing facilities, but concluded that none of those plans presented practical alternatives to building a new facility. R. 4923-28. North Eastwood explained that the site at issue in this litigation, the one it selected, was the option it felt had the least amount of impact on aquatic resources while still fulfilling its goals for the Project. R. 545. While certain alternate sites would have less environmental impact, it did not believe that those alternatives would meet the Project's needs.

The Corps issued public notice of the application in August 2018 and received numerous comments. R. 4902-07. Both the Corps and North Eastwood issued responses to comments, although the Corps often simply deferred to North Eastwood's responses. *See, e.g.*, R. 4899. After reviewing the comments received and other relevant material, the Corps released its

---

[1] The Administrative Record is contained in ECF No. 22, and the appended exhibits.

(4:19CV2771)

decision to issue the permit in September 2019. R. 4886, 4957. The Corps did not conduct any independent review of the project's economic viability, or the financial projections provided by North Eastwood. The Corps ultimately approved the site selected by North Eastwood, concluding, as it had, that there were no "practical" alternative locations for the Project. Plaintiff filed this lawsuit in November 2019 and later moved to supplement the administrative record, which the court denied in September 2020. ECF No. 32.

When a project such as this results in unavoidable environmental loss to waters of the United States, the law requires mitigatory efforts to offset the inevitable damage. 33 C.F.R. § 332.3(a). To offset the impact this Project will have on aquatic resources, the Corps required that North Eastwood purchase 30.5 wetland acre credits and 1,620 linear feet of stream credits from the Stream & Wetland Foundation's Pittsburgh North In Lieu Fee Program, servicing, *inter alia*, the Mahoning River Watershed at a cost approaching $2,000,000. R. 2910. Additionally, North Eastwood is required to preserve a specific area of wetlands and streams adjacent to Mosquito Creek that is roughly 38 acres. *Id.* This preservation component of the mitigation plan will be enforced through an environmental covenant held by the Howland Township Trustees. *Id.* In considering its approval of the proposed site, the Corps conducted a public interest review to weigh the expected benefits of the project against the foreseeable detriments. R. 4886-90. At the conclusion of its analysis, the Corps determined that the foreseeable detriments did not outweigh the expected benefits. *Id.*

Plaintiff argues the Permit's issuance was improper because the Corps' analysis of alternative sites, public interest review, and the Permit's mitigation requirements were improper. ECF No. 36 at PageID#: 5812. Specifically, Plaintiff argues that the Corps' public interest review failed to include the requisite findings related to the Project's purpose (as defined by the

3

(4:19CV2771)

Corps) and the public need for the project. *Id.* Plaintiff believes that the consideration given to possible alternatives was predetermined and failed to give practicable alternatives a fair examination. *Id.* Defendant and Intervenor move to have the Permit upheld because they argue that the Permit was issued in compliance with both the Clean Water Act and the Administrative Procedure Act. ECF No. 39-1 at PageID#: 5868. Defendant and Intervenor additionally allege that the public interest review conducted by the Corps, including determining benefits and need for the Project, was proper. *Id.*

## Standard of Review

A motion for summary judgment should be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). The party moving for summary judgment bears the initial burden of production under Rule 56. *Celotex Corp. v Catrett,* 477 U.S. 317, 319 (1986). The burden may be satisfied by providing either affirmative evidence that negates an element of the non-movant's claim or by demonstrating "an absence of evidence to support the non-moving party's case." *Id.* If the movant meets this initial burden, the non-movant must set forth the specific material facts which remain in dispute. *Burkholder v. Wykle,* 268 F. Supp. 2d 835, 839 (N.D. Ohio Feb. 22, 2002). While the evidence of the non-movant is to be believed, and all justifiable inferences drawn in his favor, he must still "do more than simply show that there is some metaphysical doubt as to the material facts." *Id.* at 840 (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986)).

Agency actions are afforded great deference, as federal agencies often possess more expertise in their fields than members of the judiciary. *Chevron, U.S.A., Inc. v. NRDC, Inc.,* 467

4

(4:19CV2771)

U.S. 837, 865 (1984). However, agency actions may be reversed by a court under the Administrative Procedure Act if the agency's actions are "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law[.]" 5 U.S.C. § 706. A court confines its review "to the administrative record, which includes all materials compiled by the agency that were before the agency at the time the decision was made." Sierra Club v. Slater, 120 F.3d 623, 638 (6th Cir. 1997) (cleaned). Thus, if the Court finds that the agency's actions were reasonable based on the administrative record, the Corps is entitled to summary judgment. Town of Norfolk v. U.S. Army Corps of Eng'rs, 968 F.2d 1438, 1445 (1st Cir. 1992).

An agency action is "arbitrary and capricious" if the agency relied on factors which Congress did not intend it to consider, entirely failed to consider an important aspect of a problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it cannot be ascribed to a difference in view or the product of agency expertise. Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983). While a court may not substitute its judgment for that of the agency, Cty. of Westchester v. U.S. Dep't of Hous. & Urban Dev., 802 F.3d 413, 430–31 (2d Cir. 2015), this highly deferential standard does not equate to no review at all, Brodsky v. U.S. Nuclear Regulatory Comm'n, 704 F.3d 113, 119 (2d Cir. 2013). To uphold an agency's action, the court must conclude that the agency examined relevant data and articulated a satisfactory explanation for its action including a rational connection between the facts found and the choice made. Motor Vehicle, 463 U.S. at 41.

**Legal Standards Under Clean Water Act**

The overall objective of the Clean Water Act is to "restore and maintain the chemical, physical, and biological integrity of the Nation's waters." 33 U.S.C. § 1251. This Act grants the

5

(4:19CV2771)

Secretary of the Army, after the opportunity for public hearings, authority to issue a permit for dredge or fill material to be discharged into navigable waters. *Sierra Club v. United States Army Corps of Eng'rs*, 772 F.2d 1043, 1050 (2d Cir. 1985). The Act prohibits the Corps from "sanctioning a project that it finds will have a significant adverse impact on the marine environment." *Id.* at 1051. The Corps may not issue a permit "unless appropriate and practicable steps have been taken which will minimize potential adverse impacts of the discharge on the aquatic ecosystem." 40 C.F.R. § 230.1(D).

The Corps must make a variety of determinations before issuing a requested permit. *See* 33 C.F.R. Part 320; 40 C.F.R. Part 230. These relevant determinations include that the project is needed and serves the public interest; that there exists no practicable less environmentally damaging alternative to the proposed project; and that any unavoidable environmental losses are offset. *See* 33 C.F.R. §§ 320.4, 332.3. Any asserted "need" by an applicant that a project must be profitable should be afforded "little or no weight." *Sierra Club v. Strock*, 495 F.Supp. 2d 1188, 1278 (S.D. Fla. 2007).[2]

A decision to issue a permit must be "based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest." 33 C.F.R § 320.4(a)(1). Federal regulations mandate that the Corps engage in a public interest review.

> The decision whether to issue a permit will be based on an evaluation of the probable impacts, including cumulative impacts, of the proposed activity and its intended use on the public interest. Evaluation of the probable impact which the

---

[2] Although the Eleventh Circuit criticized the deference the District Court afforded the agency in *Strock*, sub nom, *Sierra Club v. Van Antwerp*, 526 F.3d 1353, 1363 (11th Cir. 2008), the Sixth Circuit discussed the case, and its analysis as to need for a critical and regulation-based review of agency decision-making favorably in *Michigan Dep't of Cmty. Health v. Sec'y of Health & Hum. Servs.*, 496 F. App'x 526, 539 (6th Cir. 2012).

(4:19CV2771)

> proposed activity may have on the public interest requires a careful weighing of all those factors which become relevant in each particular case. The benefits which reasonably may be expected to accrue from the proposal must be balanced against its reasonably foreseeable detriments.

*Id*. 33 C.F.R § 320.4(a)(2) lists several general factors which[,] must be weighed by the Corps as part of every application:

   i.  The relative extent of the public and private need for the proposed structure or work;

   ii. Where there are unresolved conflicts as to resource use, the practicability of using reasonable alternative locations and methods to accomplish the objective of the proposed structure or work; and

   iii. The extent and permanence of the beneficial and/or detrimental effects which the proposed structure or work is likely to have on the public and private uses to which the area is suited

The weight given to each factor is project-specific. § 320.4(a)(3). In weighing the factors to determine if a permit should be issued, the Corps is to start with the presumption that "[m]ost wetlands constitute a productive and valuable public resource, the unnecessary alteration or destruction of which should be discouraged as contrary to the public interest." § 320.4(b)(1). The Corps is required to deny a permit when the benefits of the proposed project do not outweigh the damage to wetland resources. § 320.4(b)(4).

## Analysis

Because the Permit was issued in an arbitrary and capricious manner, Plaintiff's motion (ECF No. 36) is well-taken.

## Population Data

The most glaring issue with the Corps' analysis is that it has not properly established that it is in the public interest to authorize a project that involves the construction of massive hospital and residential facilities with a declining population in the area. R. 954. Many factors, including

7

(4:19CV2771)

many large businesses leaving the area, have led the population of this specific area of Trumbull County to decline even more than in surrounding counties. R. 4453, 4411.

    Initially, the Corps erroneously concluded that that population in the area was increasing, and relied on that finding to show that there was a public need for the Project. R. 4941. However, the Corps now concedes that the population is affirmatively in decline, and that it erroneously relied on now concededly inaccurate statements made by the Intervenor, and "data from Warren County instead of from the Town of Warren." ECF No. 42 at PageID #: 5938.

    The Town of Warren is not in, or geographically near, Warren County:

[3]

---

    [3] "A court can 'take judicial notice of a Google map and satellite image as a "source[ ] whose accuracy cannot reasonably be questioned," at least for the purpose of determining the general location of [a relevant location].'" United States v. Chaffee, No. 18CV11559, 2019 WL 8403506, at *19 (E.D. Mich. Nov. 8, 2019), report and recommendation adopted, 2020 WL 1316643 (E.D. Mich. Mar. 20, 2020) (quoting United States v. Perea-Rea, 680 F.3d 1179, 1182 n.1 (9th Cir. 2012) (quoting Fed. R. Evid.

8

(4:19CV2771)

The Corps, for the first time, in its reply brief before this Court, argues that the information concerning the population in its public need analysis was not dispositive, and that "a need for the project exists irrespective of whether population is increasing or decreasing[.]" ECF No. 42 at PageID #: 5938.  The Corps contends that North Eastwood's own decision to relocate, the age of the local population, and the development around the proposed location support the public and private need for the project.  North Eastwood's desire to increase revenues is of minimal value in the Court's analysis.  Sierra Club, 495 F.Supp. at 1278.  Furthermore, whether the population is increasing or decreasing is interrelated with both the age (and projected age) of the population, and the question of whether the area's business, educational, and medical demand can support even more development.

Most importantly, the idea that the Corps would allege that both a population increase and decrease justify a need for the project shows the Corps acted arbitrarily in its analysis.  "A court's blind adherence to the principles of agency deference, particularly when faced with the agency's own acknowledgment of serious deficiencies, is contrary to the doctrine of separation of powers."  Michigan Dep't of Cmty. Health, 496 F. App'x at 539 (cleaned up).  Either the population was truly irrelevant, in which case it should not have used an increase in population to support its initial conclusion, or it continues to push for a predetermined outcome, for which it has worked backwards to demonstrate a need.  In either case, the impact of the population growth or decline is properly assessed during agency proceedings, not in late-stage briefing before a court.

---

201(b))); *see also* Ryan v. Tennessee Valley Auth., No. 3:14CV356, 2015 WL 1962173, at *1 n.1 (E.D. Tenn. Apr. 30, 2015) (collecting cases).

(4:19CV2771)

Because the Corps, concededly, failed to consider accurate data concerning the need for the Project and its appropriate scope – the population data – its issuance of the Permit cannot be affirmed.

### Rejection of Alternate Sites as Practical Alternatives

The Corps determined there was no "practical" alternative to the proposed site. "An alternative is practicable if it is available and capable of being done after taking into consideration cost, existing technology, and logistics in light of overall project purposes." 40 C.F.R. § 230.10(a)(2). "If it is otherwise a practicable alternative, an area not presently owned by the applicant which could reasonably be obtained, utilized, expanded or managed in order to fulfill the basic purpose of the proposed activity may be considered." *Id.* "[N]o discharge of dredged or fill material shall be permitted if there is a practicable alternative to the proposed discharge which would have less adverse impact on the aquatic ecosystem, so long as the alternative does not have other significant adverse environmental consequences[.]" § 230.10(a)(1).

While the Court need not determine whether remand on the basis of inadequate consideration of alternatives is independently justified at this time,[4] discussion of the Corp's perfunctory dismissal of two alternatives sites is necessary: (1) the no-build alternative and (2)

---

[4] Failure to adequately consider alternative sites provides an independent alternative basis for remand. *Utahns v. United States DOT*, 305 F.3d 1152 (10th Cir. 2002); *Simmons v. United States Army Corps of Eng'rs*, 120 F.3d 664 (7th Cir. 1997). "'[A]n alternative within the ambit of an existing standard'—*say, a different scope of operation* or additional mitigation measures—generally 'may not be abandoned without any consideration whatsoever.'" *Save Our Cumberland Mountains v. Kempthorne*, 453 F.3d 334, 347 (6th Cir. 2006) (emphasis added) (quoting *Cent. S. Dakota Co-op. Grazing Dist. v. Sec'y of U.S. Dep't of Agric.*, 266 F.3d 889, 897 (8th Cir. 2001)).

(4:19CV2771)

the Old Avalon Golf Course.[5] The Corps' analysis of these two sites is not only independently concerning, but gives support to Plaintiff's argument that the Corps' analysis was result-oriented, and based on the applicant's project purpose, rather than guided by the statutory factors, particularly in light of the faulty population data.

*No Build Alternative*

One alternative that appears to have been prematurely dismissed is the option to renovate the existing St. Joseph Hospital on Eastland Avenue in Warren. A long list of improvements are part of the potential renovation plan for St. Joseph, but some of the major enhancements are the addition of a 4 story tower, a new cardiac laboratory, a new ICU unit, and a new 32 bed all single occupancy unit above a new emergency department. R. 534. Concerns that "the applicant did not demonstrate compliance with several aspects of the 404(b)(1) Guidelines (Guidelines) regarding purpose, need, and alternatives; avoidance and minimization; and mitigation" were expressed by the United States Environmental Protection Agency. R. 4893.

> The USEPA did not believe the applicant addressed the purpose, need, and alternatives within the application and stated that the Akron Children's Hospital has expressed interest for possible future use, not a current need. . . . The USEPA stated that the project purpose of creating an attractive facility and competing economically with area hospitals are too narrow to comply with the Guidelines and should not be considered when determining the Least Environmentally Damaging Practicable Alternative (LEDPA).

*Id.* The Corps concurred with some of the EPA's concerns, but relied on the applicant's response to the EPA's comments. R. 4899.

---

[5] R. 4921 (Old Avalon Golf Course "would require 5 acres of wetland fill and 2,500 LF of stream fill."); R. 4927 (No-build alternative 1D would, prior to any compromise or re-design, require 15.95 acres of wetland fill and 1,608.5 LF of stream fill, the equivalent of the impact of Enterprise Park considering modifications agreed to by North Eastwood.)

11

(4:19CV2771)

The applicant's response relied heavily on considerations unique to its stated purpose for the Project---particularly aesthetic values and profitability determinations, not the one adopted by the Corps.[6] R. 4894-99. The response similarly relied on needs of the population, and asserted need for a "bigger, better, and more appealing hospital[,]"[7] than the one it currently operates. R. 4897. Those purported needs are now substantially undermined by the inaccuracy of the population data.

*Old Avalon Golf Course*

Although the Old Avalon Golf Course is surrounded by multiple four-lane highways, it was rejected as not practical because there was no direct vehicle access to the land.[8] R. 4921. The Old Avalon Golf Course not only has the sufficient acreage to accommodate the Project, but it is actually 26 acres larger than the Enterprise Park site. R. 537. This site also has a proximity to the relevant geographic center and complies with all mandatory zoning requirements. *Id.* The issue with access is the purported lack of direct exit ramps from State Routes 82 and 11. R. 537. Even though the Old Avalon location may not have the quality of access the Enterprise Park site does, nothing requires that an alternative have *perfect* access to be considered a *practicable* alternative. Indeed, North Eastwood explains that its preferred site would result in an "Average

---

[6] The cost of the no-build alternative is 80-85% of the new construction and has a substantially decreased environmental impact. R. 534.

[7] North Eastwood has repeatedly endeavored to convince commentors, the Corps, and the Court that its references to making a facility that is more "appealing" or "attractive" to "aesthetic" concerns generally should not be construed as only concerned with the facility's visual appeal. *See, e.g.* R. 4896. If North Eastwood intends to refer to something other than visual considerations, it should use words that make plain its meaning, rather than contorting the definitions of words after the fact.

[8] North Eastwood also objects to use of the site due to lack of access to accessory amenities, R. 537, but such access was not found to be an appropriate criteria for the Corps' analysis. R. 4918.

(4:19CV2771)

Daily Traffic" increase from 5,228 vehicles per day, at the existing St. Joseph's Hospital, to over 115,000 at Enterprise Park. R. 4925. Neither the applicant nor the Corps explains why this level of extraordinary increase is *necessary* for an alternate site to be considered practical.

## Conclusion

For the reasons set forth above, this Court finds that the action of the Corps was arbitrary and capricious, an abuse of discretion, and in violation of section 404 of the Clean Water Act. The Court need not, and does not address, Plaintiff's remaining claims of error. The Court grants Plaintiff's Motion for Summary Judgment (ECF No. 36), and denies those filed by the Corps (ECF No. 37) and North Eastwood (ECF No. 39). The Corps' issuance of the Permit is vacated, and the Court remands the case for further proceedings consistent with this ruling.

IT IS SO ORDERED.

| | |
|---|---|
| September 9, 2021 | /s/ Benita Y. Pearson |
| Date | Benita Y. Pearson |
| | United States District Judge |